IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DIALECT, LLC,
    Plaintiff,

    v.

AMAZON.COM INC., *et al.*,
    Defendants.

<u>**UNDER SEAL**</u>

Civil No. 1:23cv581 (DJN)

<u>**MEMORANDUM ORDER**</u>
**(Denying *Daubert* Motions)**

    This matter comes before the Court on the parties' *Daubert* motions: (1) Plaintiff Dialect, LLC's Motion to Exclude the Testimony of Defendants' Expert Michael T. Johnson ("Johnson Motion") (ECF No. 287); (2) Dialect's Motion to Exclude the Testimony of Defendants' Expert Jeffrey H. Kinrich ("Kinrich Motion") (ECF No. 299); and (3) Defendants Amazon.com, Inc. and Amazon Web Services, Inc.'s (together, "Amazon") Motion to Exclude the Testimony of Plaintiff's Expert Jim W. Bergman ("Bergman Motion") (ECF No. 302). These motions have been fully briefed, (ECF Nos. 289, 301, 311, 337, 341, 347, 370, 378, 384), rendering them ripe for resolution. For the reasons set forth below, the Court hereby DENIES the Johnson Motion (ECF No. 287), Kinrich Motion (ECF No. 299) and Bergman Motion (ECF No. 302).

## I.      BACKGROUND

    The Court assumes the reader's familiarity with the underlying proceedings and the Asserted Patents. In short, Amazon owns, sells and develops a proprietary virtual assistant, Alexa, that analyzes and responds to spoken words. Amazon incorporates Alexa into popular products like Amazon Echo and Amazon Fire TV. Dialect claims that Alexa, and therefore

Amazon, infringes patents that had been assigned to Dialect by a now-defunct firm called VoiceBox, LLC.

At the outset of this proceeding, Dialect asserted seven different patents. At the motion to dismiss stage, Senior District Judge T.S. Ellis, III, invalidated one of those patents, U.S. Patent No. 9,031,845, as being drawn to patent-ineligible subject matter. *Dialect, LLC v. Amazon.com, Inc.*, 701 F. Supp. 3d 332, 342 (E.D. Va. 2023). After this case was transferred to the undersigned (ECF No. 137), the Court dismissed another patent, U.S. Patent No. 8,140,327 (the "'327 Patent"), upon finding that Amazon's products did not infringe that patent as a matter of law. *1st Summ. J. Op.*, 2024 U.S. Dist. LEXIS 140767, at *59–65. Five patents (the "Asserted Patents") thus remain in controversy.[1]

## II.      LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if" all the following conditions are satisfied:

> (a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

---

[1]      The Asserted Patents include U.S. Patent Nos. 7,693,720 (the "'720 Patent"); 8,015,006 (the "'006 Patent"); 8,195,468 (the "'468 Patent"); 9,263,039 (the "'039 Patent"); and 9,495,957 (the "'957 Patent").

Rule 702 thus establishes "a district court's gatekeeping responsibility to 'ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  In undertaking this gatekeeping function, district courts enjoy "broad latitude" to consider "the unique circumstances of the expert testimony involved." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).  The Rule 702 inquiry thus necessarily proves "flexible," focusing on the expert's "principles and methodology" rather than the conclusions that the expert draws.  *Id.*

"A reliable expert opinion must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).  Courts look to several factors as indicia of reliability, including "testing, peer review, evaluation of rates of error, and general acceptability" in the expert's field.  *Id.*

Regarding relevance, the Court must ask "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591.  The relevance inquiry is one of "fit" — expert testimony must demonstrate "a valid . . . connection to the pertinent inquiry as a precondition" of admissibility. *Id.* at 592.

Throughout its Rule 702 analysis, a district court must remain cognizant of two bedrock, yet competing principles.  On the one hand, Rule 702 "was intended to liberalize the introduction of relevant expert evidence." *Westberry*, 178 F.3d at 261.  District courts therefore "need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct."  *Id.*  On the other hand, expert testimony often proves uniquely capable of confusing or misleading the jury.  *Id.*  "Proffered evidence that has a greater potential to mislead

3

than to enlighten" should therefore be excluded. *Id.* Critically, the proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. Fed. R. Evid. 702; *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

### III.   DISCUSSION

#### A.   Johnson Motion

The Court begins by addressing whether Dr. Johnson's opinions on technical comparability suffice to meet the *Daubert* standard.[2] Next, the Court assesses whether Dr. Johnson's opinions regarding non-infringing alternatives prove sufficiently reliable to warrant admission.[3]

##### 1.   Technical Comparability

Under 35 U.S.C. § 284, which governs damages in patent infringement cases, a patentee stands entitled to damages "in no event less than a reasonable royalty for the use made of the invention by the infringer." A reasonable royalty may be calculated by constructing a "hypothetical negotiation" that "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). "The hypothetical

---

[2]   The parties brief the issue of technical comparability in the Kinrich Motion. (*See* ECF Nos. 347, 370, 311.) However, as Mr. Kinrich, Amazon's damages expert, relies on the technical comparability analysis of Dr. Johnson, Amazon's technical expert, the Court analyzes its admissibility here. (ECF No. 347 at 3.)

[3]   Dialect also seeks to exclude Dr. Johnson's opinions regarding the availability of an alleged prior art reference to the '327 Patent. (ECF No. 289 at 2–4.) The Court's entry of partial summary judgment of noninfringement on all claims of the '327 Patent renders that argument moot.

negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." *Id.* at 1325.

When estimating a reasonable royalty, parties frequently rely on "the royalty rate from sufficiently comparable licenses." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). "Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372–73 (Fed. Cir. 2020). Once a license satisfies a baseline of comparability, the degree of comparability between licenses goes to the weight of the testimony and not its admissibility. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).

Amazon's damages expert, Mr. Kinrich, based his reasonable royalty calculation on Amazon's acquisition of patents from ▮▮▮▮▮ (the "▮▮▮ Patents") and ▮▮▮▮ ▮▮▮▮ (the "▮▮ Patents"). In doing so, he relied on Dr. Johnson's opinion that the ▮▮▮ and ▮▮ Patents qualify as technically comparable to the Asserted Patents. (ECF No. 347 at 3.) In Dialect's view, Dr. Johnson assumed technical comparability solely because the patents all relate to natural language understanding. (ECF No. 301 at 12.) Amazon, in response, argues that Dr. Johnson goes beyond merely identifying the ▮▮ and ▮▮ Patents as existing in the same general field as the Asserted Patents; he also analyzes specific claims of the ▮▮ and ▮▮ Patents and describes how those claims relate to concepts disclosed in the Asserted Patents. (ECF No. 347 at 9 (citing ECF No. 234-4 ("Johnson Reb.")).)

The Court agrees with Amazon's position and finds that Dr. Johnson has made the requisite showing of "baseline comparability." *Bio-Rad Lab'ys*, 967 F.3d at 1374. In his report,

Dr. Johnson describes each comparable patent in detail and refers to a representative claim. (Johnson Reb. ¶¶ 740–44 (describing one of the ████ Patents), ¶¶ 749–52 (describing two of the ████ Patents).) Analyzing U.S. Patent No. ████ (the "██ Patent"), the only ████ Patent with any remaining term, Dr. Johnson concluded that the claimed invention, like the inventions disclosed by each of the Asserted Patents, "describes the use of context in recognizing, interpreting, and responding to a voice utterance." (*Id.* ¶ 744.) Dr. Johnson further elaborated that the ██ Patent "discloses the use of context to improve accuracy of interpretation, and knowledge from current and previous dialogs to interpret an utterance" like the '720 and '006 Patents; "scores possible interpretations" and "utilizes preliminary confidence levels to calculate accuracy of possible interpretations" like the '039 Patent; and "creat[es] context information from recent discussions to determine the user's meaning" like the '468 and '957 Patents. (*Id.*) Likewise, Dr. Johnson's report analyzes the similarities between two ████ Patents (U.S. Patent Nos. ████ and ████) and the Asserted Patents, and it addresses the specific technology enabled by these patents. (*Id.* ¶¶ 750, 752.) Dr. Johnson's comparability analysis features more detail and rigor than analyses approved by the Federal Circuit. *See Bio-Rad Lab'ys*, 967 F.3d at 1375 (finding technical comparability where both sets of patents related to the field of microfluids, and more specifically to the use of droplet technology). Accordingly, the Court finds Dr. Johnson's comparability opinion admissible.

In truth, at its core, Dialect takes issue with the conclusions reached by Dr. Johnson and the factual assumptions and considerations underlying those conclusions, not with his methodology. However, these disagreements go to the weight of the testimony, not its admissibility. *ActiveVideo Networks*, 694 F.3d at 1333; *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[T]he fact that a license is not perfectly analogous

generally goes to the weight of the evidence, not its admissibility.") The degree of comparability between the Asserted Patents and the ▨▨▨ and ▨▨ Patents constitutes a factual issue best addressed by cross examination — not by exclusion. *ActiveVideo Networks*, 694 F.3d at 1333.

## 2. Non-Infringing Alternatives

Next, the Court assesses whether Dr. Johnson's opinions regarding non-infringing alternatives must be excluded pursuant to Rule 702. For the following reasons, the Court finds that Dr. Johnson's opinion rests on a reliable foundation and thus will not exclude his testimony.

The Federal Circuit has recognized more than one reliable method for estimating a reasonable royalty. *Summit 6*, 802 F.3d at 1296. In addition to using the royalty rate from comparable licenses, parties may also "value the infringed features by comparing the accused product to non-infringing alternatives." *Id.* To qualify as an acceptable non-infringing substitute, a product or process must be "available or on the market at the time of infringement." *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1348 (Fed. Cir. 1999); *see also TQP Dev., LLC v. Merrill Lynch & Co.*, 2012 WL 3283354, at *1 (E.D. Tex. Aug. 10, 2012) (Bryson, J., sitting by designation) (considering non-infringing alternatives in the reasonable-royalty context).

Dr. Johnson opines that Amazon could have implemented a similar architecture to the Large Language Model ("LLM") as a non-infringing alternative to the accused Alexa functionality. Dialect submits that LLMs do not qualify as an acceptable non-infringing alternative, because the hypothetical negotiations would have taken place in 2016 and 2018,[4]

---

[4]     For the purpose of resolving the Johnson Motion, Dialect assumes (but does not accept) that the hypothetical negotiations would have been conducted in 2016 and 2018, as understood by Dr. Johnson. (ECF No. 289 at 5.)

7

"well before LLMs had begun to appear on the market." (ECF No. 289 at 5.) According to Dialect, Amazon seeks "to implement [LLMs] *now*" as a non-infringing alternative and has unsuccessfully sought to integrate LLMs into Alexa since 2022 — years after the date of the hypothetical negotiations. (*Id.* at 4–5; ECF No. 378 at 4 (emphasis in original).)

However, Dialect mischaracterizes Dr. Johnson's report. Although Dr. Johnson indicates that certain Alexa components can be replaced with an LLM, which admittedly is "something Alexa is doing today," he explains that Amazon could avoid infringement by implementing a similar approach by using technology available at the time of the hypothetical negotiation, not by using modern LLMs:

> [A] similar approach could have been implemented using earlier technology. For example, in 2016 Amazon could have implemented something similar to their current LLM approach using maximum entropy technology. In the 2018 timeframe, Amazon could have implemented a similar approach using [deep neural network] technology. . . . In all cases the functionality would have been similar in that ▮
>
> The result would have been a similar architecture to the LLM.

(ECF No. 378-3 ("Johnson Op.") ¶ 2624.) Thus, Dr. Johnson does not opine that Amazon, as of the hypothetical negotiations in 2016 and 2018, could implement the same LLM that it uses today. Rather, Dr. Johnson explains that Alexa's allegedly infringing components could be substituted with non-infringing alternatives that used "a similar architecture to the LLM," and that those alternatives were available in 2016 and 2018. Dialect offers no evidence to suggest that the non-infringing alternatives actually proposed by Dr. Johnson were not technically feasible.[5] Its objections thus wholly miss the mark.

---

[5]    To the contrary, in its opposition brief to Amazon's second motion for summary judgment, Dialect acknowledges that deep neural network technology has been "well known in

In any event, Dr. Johnson's opinion rests on a reliable foundation. In Dialect's view, Dr. Johnson relies solely on conversations with Amazon's engineer, Dr. Imre Kiss, to determine that the non-infringing alternatives would have been technically feasible at the time of the hypothetical negotiation. According to Dialect, "[t]his type of parroting of a party employee without any independent analysis" qualifies as improper expert testimony. (ECF No. 289 at 6.) Dr. Johnson does rely, in part, on Dr. Kiss's testimony — a natural choice given Dr. Kiss's central role in developing many of the accused Alexa features, not to mention his work on LLM implementation. (ECF No. 337 at 10.) However, Dr. Johnson relied on more than Dr. Kiss in reaching his opinion. Dr. Johnson also based his opinion on Amazon's technical documents and provided his own comprehensive analysis of the accused Alexa functionality. (*See generally* Johnson Reb. ¶¶ 49–180.) Dr. Johnson also relied on his own knowledge of large language models, deep neural networks and statistical models to form an opinion regarding technical feasibility. (ECF No. 337-3 ("Johnson Dep.") at 69:3–5.) Dr. Johnson's reliance on these various sources indicates that his methodology was sufficiently reliable to warrant the admission of his views. *See, e.g., TQP Dev.*, 2012 WL 3283354, at \*2 (declining to exclude expert testimony where an expert consulted an engineer, reviewed documentary evidence and relied on various public documents).

## B. Kinrich Motion

Having concluded that Dr. Johnson's opinion on technical comparability rests on sound methodology, the Court easily resolves the Kinrich Motion. Dialect argues that Mr. Kinrich may not rely on the ▉▉▉▉ and ▉▉ Patents, because they lack technical and economic comparability to the Asserted Patents in this case. (ECF No. 301 at 10, 16.) Specifically, in

the field of computer science and natural language understanding since before the filing dates of the [Asserted] Patents." (ECF No. 348 at 20.)

Dialect's view, Mr. Kinrich fails to account for uncertainty regarding the validity of the ▮▮▮

and ▮▮▮ Patents, rendering them economically non-comparable. (*Id.* at 16.) As Amazon

would have it, Mr. Kinrich performs his own comprehensive analysis of the economic

comparability of the ▮▮▮ and ▮▮▮ agreements. (ECF No. 347-2 ("Kinrich Rpt.")

¶¶ 260–61, 265–66.) As previously explained with respect to the Johnson Motion, the parties'

disagreements go to the weight to be afforded the testimony, not its admissibility. *See i4i Ltd.*

*P'Ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011)

(holding that a party's quarrel with the facts that the damages expert used go to the weight, not

admissibility, of the expert's opinion). The degree of comparability and any purported failure on

the part of Mr. Kinrich to account for economic differences constitute factual issues best

addressed by cross examination. *ActiveVideo Networks*, 694 F.3d at 1333.[6]

### C. Bergman Motion

Amazon presents four justifications to exclude the opinions of Dialect's damages expert,

Mr. Bergman: (1) that he applies the wrong hypothetical negotiation date; (2) that his opinions

prove inconsistent with the Court's construction of "context"; (3) that he fails to account for

Amazon's contributions to the accused products; and (4) that his "next-best alternative" approach

lacks a technical foundation. (ECF No. 311 at 1–2.) The Court addresses these arguments in

turn.

---

[6]    In addition, Dialect argues that Mr. Kinrich cannot opine that the amount that Apple paid
for its license qualifies as comparable to the amount Amazon would pay for a license to the '327
Patent. (ECF No. 301 at 20–23.) Because the Court has granted Amazon summary judgment of
noninfringement on all claims regarding the '327 Patent, the Court refrains from addressing this
issue.

### 1.      Hypothetical Negotiation Date

The parties agree that Mr. Bergman assumes November 2014 as the date of first infringement based on the opinions of Dialect's technical expert, Dr. Hosagrahar Jagadish. (*Id.* at 16; ECF No. 341 at 1.) Amazon urges the Court to exclude Mr. Bergman's entire damages opinion, because his reasonable royalty rests on the wrong hypothetical negotiation date. (ECF No. 311 at 15.) In Amazon's view, the first alleged infringement of the '006 Patent did not occur until 2018, ████████████████████████████████████████. (*Id.* at 16.) In response, Dialect highlights that the parties' dispute constitutes a factual one between technical experts regarding the date of first infringement. (ECF No. 341 at 8 ("This dispute [] turns entirely on the technical experts' opinions about the earliest date of infringement of the '006 Patent.").) The Court agrees with Dialect and will not exclude Mr. Bergman's damages opinion merely because the parties' experts reached different conclusions based on competing versions of the facts.

In his opening report, Dr. Jagadish lists the products accused of infringement, including the first Alexa-enabled product (i.e., the Echo), which launched in November 2014, and opines that the "Accused Products and Services" infringe the '006 Patent. (ECF No. 234-2 ("Jagadish Op.") ¶¶ 36, 42.) In an analysis spanning 24 pages, Dr. Jagadish then provides his opinion on direct infringement of the '006 Patent. (*Id.* ¶¶ 385–473.) In response to Amazon's conclusion that Dr. Jagadish's infringement theories do not apply to the early Echo products because his mappings rely on ████████████████████████████████████, (ECF No. 384 at 3 (citing Johnson Reb. ¶ 215)), Dr. Jagadish explains that "the use ████████ . . . is not required for infringement." (ECF No. 255-4 ("Jagadish Reply") ¶ 143.) Before the release of ████████, Alexa used a legacy routing path, and Dr. Jagadish's direct infringement analysis applies equally to that legacy system. (*Id.* ¶¶ 142–143.) In sum, Dr. Jagadish (Dialect's

11

technical expert) and Dr. Johnson (Amazon's technical expert) disagree as to whether the legacy routing system infringed when the Echo was first launched in November 2014.

"When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003). Here, the technical experts offer competing views of the date of first infringement — a factual dispute that cannot be resolved at this stage. *See Fujifilm Corp. v. Motorola Mobility LLC*, 2015 WL 1265009, at *5 (N.D. Cal. Mar. 19, 2015) (denying summary judgment on the date of first infringement); *but see LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012) (requiring a new trial on damages where there remained "no dispute" over the date of the first direct infringement). Accordingly, the Court rejects Amazon's first argument as grounds to exclude Mr. Bergman's damages opinion in its entirety.

### 2.    Construction of "Context"

Next, Amazon argues that the Court should exclude Mr. Bergman's opinion, because he disregards the Court's claim construction to calculate damages based on his own plain and ordinary understanding of "context."[7] (ECF No. 311 at 20–21.) In doing so, Mr. Bergman purportedly captures uses outside the scope of the asserted method claims in calculating damages for "Multi-Turn Context," "Named Voice Profile" and "Multi-Modal Context." (*Id.* at 21–22.) In Amazon's view, because Mr. Bergman fails to separate out the value of non-infringing use from the alleged infringing uses, his damages opinion must be excluded. (*Id.*) The Court easily rejects this argument. Although damages experts must "separate out noninfringing uses" in their damages calculations when patentees assert method claims, *Niazi Licensing Corp. v. St. Jude*

---

[7]    The Court construed "context" as "the subject matter area to which a particular user input is directed and which is used to determine the meaning of the user input." (ECF No. 213 at 1.)

*Med. S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022), the Court will not exclude Mr. Bergman's opinion on this basis, because his analysis appropriately limits damages calculations to infringing uses under the Court's claim construction.

As Dialect rightfully notes, Amazon begins from the erroneous premise that Mr. Bergman bases his opinion on his "high-level understanding" that "context is using something that's known about the user or what the user said in part of an overall interaction with a device." (*Id.* at 21 (citing ECF No. 341-2 ("Bergman Dep.") at 110:15–24).) The lines that immediately follow, however, make clear that Mr. Bergman relies on Dr. Jagadish's infringement analysis to calculate damages:

> Q: Are you applying your high-level understanding here?
>
> A: This comes from Dr. Jagadish, this is Dr. Jagadish's opinions. I'm taking what Dr. Jagadish has identified as the benefit attributable to the patented technology and then I'm quantifying that. So I'm not providing opinions as to exactly what context means in terms of claims or any of the particular claim language. I'm quantifying the benefit.

(*Id.* at 110:25–111:9.) As Amazon's counsel pressed the issue, Mr. Bergman continued to reiterate that he relied on Dr. Jagadish's technical expertise, not his own understanding, to assess damages. (*See, e.g.*, *id.* at 111:13–14 ("Again, this is language I'm getting from Dr. Jagadish."); *id.* at 112:13–21 (affirming that he relied on Dr. Jagadish's opinion that "but-for Amazon's infringement of the Multi-Model Context claims, Amazon would not be able to provide improved comprehension of a multi-modal interaction through context and personalization"); *id.* at 128:12–18 ("[W]hen I quantify damages, it's based on my discussions with Dr. Jagadish with regards to the scope of the claims . . . [,]" which "include[s] the construction of 'context' as well as any other claim term that's been construed."); *id.* at 131:19–25 (reiterating that he is "not qualified" to answer whether certain examples "lie outside the utterances themselves as the court

construed 'context'").)  And Amazon does not argue that Dr. Jagadish's theories qualify as
inconsistent with the Court's claim construction.

"For areas outside [his] expertise," a damages expert "could, indeed must, rely upon []
other experts."  *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1303 (Fed.
Cir. 2015).  As the record demonstrates, Mr. Bergman did just that.  Dr. Jagadish explains how
certain features infringe the Asserted Patents under the Court's claim construction, and Mr.
Bergman relies on Dr. Jagadish's infringement opinions to ascertain the royalty for Amazon's
use of those specific features.  Thus, the Court rejects Amazon's second argument.

### 3.    Apportionment

Amazon further argues that the Court should exclude Mr. Bergman's opinion, because he
fails to account for Amazon's own technical and economic contributions to Alexa.  (ECF No. 311
at 25.)  Dialect contends that, consistent with the apportionment principle, Mr. Bergman begins
by calculating the incremental benefit of the patented technology using Amazon's own
documents.  (ECF No. 341 at 23.)  Then, relying on "bounty agreements" as a proxy, Mr.
Bergman applies an 80/20 bargaining split on this incremental benefit from the patented
invention.[8]  (*Id.*)  The Court rejects Amazon's third challenge and finds that Mr. Bergman used a
proper apportionment method.

To be admissible, an expert damages opinion "must separate the value of the allegedly
infringing features from the value of all other features."  *VirnetX, Inc. v. Cisco Sys., Inc.*, 767

---

[8]     The parties do not dispute that Mr. Bergman relied on "bounty agreements," which do not
qualify as patent licenses, to assign the 80/20 bargaining split.  (ECF No. 341 at 28; Bergman
Op. ¶ 548.)

(Bergman Op. ¶ 548.)

(*Id.* ¶ 549; ECF No. 341 at 25.)

14

F.3d 1308, 1329 (Fed. Cir. 2014); *see also VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1345 (Fed. Cir. 2023) (recognizing that a reasonable royalty must be "apportion[ed]" to the value of the patented technology).  In other words, a reasonable royalty measures the "value of what was taken." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).  As the Federal Circuit has explained, a damages expert may apportion in various ways, but "the essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Id.*; *see also Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (recognizing that, "under [the] apportionment principle, there may be more than one reliable method for estimating a reasonable royalty").

The Federal Circuit's decision in *Rembrandt Wireless Technologies, LP v. Samsung Electronics Co.*, 853 F.3d 1370 (Fed. Cir. 2017), proves instructive to the case presented here.  In *Rembrandt*, the patent owner's damages expert determined the incremental value associated with implementing the infringing functionality by comparing the prices of two semiconductor chips — one with the infringing functionality and the other without.  *Id.* at 1380.  The infringer argued that the damages expert improperly attributed the chips' cost differential solely to the addition of the infringing functionality.  *Id.* at 1381.  In the infringer's view, the infringing functionality was not the only technological difference between the two sets of chips.  *Id.*  The Federal Circuit rejected this argument, concluding that such an issue "goes to evidentiary weight, not [its] admissibility." *Id.* (citation omitted).  Accordingly, the Federal Circuit found that the district court acted within its discretion by permitting the patentee's expert to use the methodology that he adopted.  *Id.*

15

Likewise, here, Mr. Bergman determined the incremental benefit associated with implementing the infringing functionality by measuring the differences between the infringing system and next-best alternative. (Bergman Reply ¶ 69; *see generally* Bergman Op. ¶¶ 217–386.) Amazon criticizes Mr. Bergman's analysis, arguing that he fails to fully "isolate the contributions of the patents." (ECF No. 311 at 26.) For instance, Amazon points to the "Named Voice Profile" feature and contends that the claim limitations do not cover "use of Voice ID by components downstream of the speech recognition engine." (*Id.*) Although Amazon stands free to cross-examine Mr. Bergman on this issue, such a disagreement does not warrant exclusion. *See Rembrandt*, 853 F.3d at 1381 (concluding that the infringer could have cross-examined the patentee's expert on whether his reasonable royalty calculation captured more than infringing functionality). Because Mr. Bergman's analysis assumes that all aspects of the Accused Products and non-infringing system qualify as the same except for the infringing functionality, his methodology calculates a reasonable royalty "based on the incremental value that the patented invention adds to the end product." *Ericsson*, 773 F.3d at 1226.

Moreover, *MLC Intellectual Property, LLC v. Micron Technology, Inc.*, 10 F.4th 1358 (Fed. Cir. 2021), does not necessitate a different outcome. Amazon argues that Mr. Bergman cannot rely on a 2013 VoiceBox agreement and Amazon's payments to partners to account for apportionment. (ECF No. 311 at 27; ECF No. 384 at 17–18.) According to Amazon, Federal Circuit precedent clearly establishes that "if a damages expert intends to rely on an agreement for apportionment, that agreement must be comparable." (ECF No. 384 at 17–18 (citing *MLC*, 10 F.4th at 1374).) However, that principle qualifies as inapplicable here, because unlike the expert in *MLC*, Mr. Bergman did not use a "comparable license approach" to apportion for the value of the patented technology. *MLC*, 10 F.4th at 1363, 1374 (affirming exclusion of expert testimony

where the damages expert failed to apportion under a comparable license approach). Rather, under an income approach, Mr. Bergman first determined the incremental benefit associated with implementing the infringing functionality by "measur[ing] the differences between the infringing system and a non-infringing system." (Bergman Reply ¶ 69.) Mr. Bergman then envisioned a hypothetical negotiation in which the parties would have bargained for an 80/20 split of that incremental benefit.[9]  (Bergman Op. ¶ 551.)

In sum, the Court concludes that Mr. Bergman employed sound methodology to account for apportionment. Accordingly, the Court will allow Mr. Bergman to present his testimony, leaving disputes over his credibility or over the accuracy of the underlying facts for the jury.

### 4.   "Proposed Next-Best Alternative" Opinions

Lastly, the Court addresses Amazon's argument that Mr. Bergman's methodology lacks technical support, because his reasonable royalty opinion relies on Dr. Jagadish's undisclosed "Proposed Next-Best Alternative" opinions. (ECF No. 311 at 29.)  In Amazon's view, Mr. Bergman relies solely on his discussions with Dr. Jagadish, which warrants exclusion of Mr. Bergman's "Incremental Benefit" reasonable royalty opinion. (*Id.* at 28.)  In response, Dialect argues that Mr. Bergman properly relied on Dr. Jagadish's opinions regarding "next-best non-infringing alternatives," because Dr. Jagadish analyzes each of Amazon's proposed non-infringing alternatives in Section XIII of his report. (ECF No. 341 at 28 (citing Jagadish Op. ¶¶ 890–909).)  In its reply, Amazon submits that Dialect conflates the next-best-alternative

_____

[9]     Indeed, the instant case qualifies as akin to *Summit 6, LLC v. Samsung Electronics Co.*, 802 F.3d 1283 (Fed. Cir. 2015), where the Federal Circuit affirmed that the district court properly allowed the patentee's expert to testify regarding his apportionment methodology. *Id.* at 1299. There, as here, the patentee's expert "first estimated [the infringer's] economic benefit from infringement by specifically focusing on the infringing features," and then he allocated the incremental profit based on the parties' respective bargaining positions. *Id.* at 1298.

17

opinions in Mr. Bergman's report with Dr. Jagadish's opinion addressing non-infringing alternatives. (ECF No. 384 at 18.) The Court rejects Amazon's last argument challenging Mr. Bergman's opinions and will allow Mr. Bergman to present his reasonable royalty opinion.

There exists two "alternative categories of infringement compensation": "the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining." *Lucent Techs.*, 580 F.3d at 1324. "The reasonable royalty theory of damages . . . seeks to compensate the patentee not for lost sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015). In the reasonable-royalty context, parties may consider the next-best alternative to infringement:

> When an infringer can easily design around a patent and replace its infringing goods with non-infringing goods, the hypothetical royalty rate for the product is typically low. . . . By the same reasoning, if avoiding the patent would be difficult, expensive, and time-consuming, the amount the infringer would be willing to pay for a license is likely to be greater.

*Id.* Thus, the availability of non-infringing alternatives (or lack thereof) may affect the reasonable royalty that an accused infringer would be willing to pay under the hypothetical-negotiation construct.

According to Dr. Jagadish, none of the alleged non-infringing alternatives "could be implemented in a non-infringing way without disabling the accused features or significantly impacting the performance of the product." (Jagadish Op. ¶ 891.) For instance, as to the HypRank functionality, Dr. Jagadish explains:

> To the extent that any of Amazon's allegedly non-infringing alternatives could even be implemented, they would significantly harm the ability of the dynamic routing component to route requests and responses to and from the skills and speechlets. For example, the elimination of the knowledge of whether a user was speaking to a device with a screen would allow for incompatible skills or speechlets to be selected.

18

(*Id.* ¶ 892.)  In other words, there are no non-infringing substitutes that could feasibly implement

the accused features.  Thus, the next-best alternative, at least according to Dr. Jagadish, lacks the

patented features disclosed in the Asserted Patents.  Although Mr. Bergman references

"[d]iscussion[s] with Dr. Jagadish," (Bergman Op. ¶ 198 n.496), Dr. Jagadish's expert report also

provides a sufficient basis for Mr. Bergman's analysis.  Accordingly, the Court finds that Mr.

Bergman's incremental benefit analysis rests on a technical foundation.

## IV.    CONCLUSION

At its core, the parties do not challenge the methodologies employed by the experts.

Rather, the parties contest the conclusions reached by those experts based on competing versions

of the facts.  "Where the methodology is sound and the evidence relied upon is sufficiently

related to the case, disputes over the expert's credibility or over the accuracy of the underlying

facts are for the jury."  *Summit 6, LLC*, 802 F.3d at 1299.  Accordingly, the Court hereby

DENIES the *Daubert* motions (ECF Nos. 287, 299, 302).

Lastly, the Court notes that it issues this Memorandum Order under seal in the first

instance to guard the parties' sensitive commercial information.  However, this Memorandum

Order stands subject to a common law "presumption of access" — a presumption that can be

rebutted by a showing that "countervailing interests heavily outweigh the public interests in

access."  *United States ex rel. Oberg v. Nelnet, Inc.*, 105 F.4th 161, 171 (4th Cir. 2024) (citation

omitted).  Accordingly, the Court hereby DIRECTS the parties to move jointly to file the

Memorandum Order under partial seal, pursuant to Local Rule 5(C), within seven (7) days of the

date of this Order.  The parties' joint motion must propose and justify narrowly tailored

redactions that would permit public issuance of the Court's Memorandum Order to the greatest

possible extent.  On the same day that the parties file their joint motion, the parties shall submit a

PDF copy of the Court's Memorandum Order by e-mail to the chambers of the undersigned, with all proposed redactions highlighted.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Alexandria, Virginia
Date: August 29, 2024

20